**Opinion issued July 6, 2023**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00286-CR, NO. 01-22-00287-CR

_____

### STEPHEN CHARLES HERNANDEZ, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 207th District Court
Comal County,[1] Texas
Trial Court Case Nos. CR2016-725 & CR2016-726**

---

[1]   The Texas Supreme Court transferred this appeal from the Court of Appeals for the Third District of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (authorizing transfer of cases between courts of appeals). Under the Texas Rules of Appellate Procedure, "the court of appeals to which the case is transferred must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court." Tex. R. App. P. 41.3. The parties have not cited, nor has our own research revealed, any conflict between the precedent of the Third Court of Appeals and that of this court on any relevant issue.

**MEMORANDUM OPINION**

A jury found appellant Stephen Charles Hernandez guilty of the first-degree felony offenses of aggravated sexual assault of a child and sexual assault of a child. Appellant pleaded true to an enhancement paragraph and, in accordance with the trial court's charge, the jury sentenced appellant to confinement for life. In two issues, appellant contends that (1) the trial court erred in denying his challenges for cause to two prospective jurors and (1) the evidence is insufficient to support his convictions. We affirm.

**Background**

In September 2016, appellant was charged by indictment with one count of aggravated sexual assault of a child (Cause No. 2016-725) and one count of sexual assault of a child (Cause No. 2016-726). The indictments included an enhancement paragraph alleging that appellant had been previously convicted of a third-degree felony sex offense in Maryland. Appellant pleaded not guilty to the charged offenses. The cases were consolidated and tried together.

At trial, appellant stipulated to the enhancement paragraph regarding his previous out-of-state conviction. Following opening statements, the State called the following witnesses: Michaela Vick, Julie Wiley, Angie Mickey, Danny Dufer, Ronald Womack, Ashlyn Henshaw, H.B., the complainant, and Noella Hill.

2

### 1. Michaela Vick

Michaela Vick, a crime scene technician with the Comal County Sheriff's Office, testified that appellant's fingerprints matched the fingerprints on a prior judgment of conviction for a third-degree sex offense involving a child in Maryland in 1992. The arrest report, which was attached to the out-of-state judgment, stated that the complainant alleged appellant fondled her vaginal and breast areas on numerous occasions while she babysat his children.

### 2. Julie Wiley

Wiley was an assistant principal at Mountain Valley Middle School in Canyon Lake. H.B. was an eighth grader at the school in 2016.

On the morning of March 9, 2016, H.B. was sent to Wiley's office for a dress code violation. Wiley testified that typically a student either changes clothes or is picked up by a parent. She testified that H.B.'s dress code violation was not a serious issue.

Before Wiley reached her office, H.B. ran down the hallway and out of the school. Wiley testified that when she caught up to H.B., she was "very heated, animated"' and yelled "you can't make me go back" and "I'm not going home to that pedophile." When Wiley and H.B. returned to school, H.B. refused to talk to Wiley but spoke with the school counselor, Angie Mickey. Upon learning what H.B.

had shared with Mickey, Wiley called Children's Protective Services (CPS) and law enforcement.

### 3. Angie Mickey

The State designated Mickey as its outcry witness. In 2016, Mickey was the school counselor at Mountain Valley Middle School.

On March 9, 2016, Wiley brought H.B. to Mickey's office to speak with her. Mickey testified that H.B. was crying and very upset. H.B. told Mickey that her mom's boyfriend fondled her breasts and genitalia, that he bought her gifts in exchange for performing sexual acts, and that she performed "blow jobs" on him. H.B. told Mickey that her mom's boyfriend bought her a phone and a pass to an amusement park in exchange for performing sexual acts on him when they lived in Iowa. H.B. told Mickey that the sexual abuse began when she was in sixth grade.

H.B. told Mickey that, on the previous day, her mother walked in while H.B. was performing oral sex on her mom's boyfriend, and that her mom called her a "whore." Mickey testified that she learned through school records that H.B.'s mother's boyfriend was Stephen Hernandez. Mickey testified that H.B. was afraid the abuse would happen again if she went home and was fearful that someone would find out.

### 4. Sergeant Dufer

Sergeant Dufer with the Comal County Sheriff's Office was assigned to investigate the sexual assault case involving appellant. Sergeant Dufer ordered a forensic interview of H.B. at the Children's Advocacy Center (CAC) and a sexual assault nurse examiner (SANE) exam. Following the CAC interview, Sergeant Dufer executed a search warrant on H.B.'s residence to collect any physical and forensic evidence present at the home.

Sergeant Dufer testified that he collected a pair of basketball shorts and an orange t-shirt from a clothes hamper in the bathroom that H.B.'s mother shared with appellant. He interviewed several people including H.B., her mother and grandmother, appellant's boss and co-workers, appellant's daughters, and a family friend. Sergeant Dufer discovered that H.B. had a membership pass to Adventureland in Des Moines, Iowa, and that appellant had been previously convicted of a third-degree sex offense in in Maryland.

As part of the investigation, Sergeant Dufer ordered swabs be taken from the floor of appellant's bedroom and H.B.'s bedroom closet where appellant allegedly ejaculated the day before H.B.'s outcry. Sergeant Dufer testified that the lab results of those swabs were inconclusive.

**5.     Sergeant Womack**

Sergeant Womack of the Comal County Sheriff's Office assisted in the execution of the search warrant on H.B.'s residence in March 2016. He operated the department's coherent laser system used to detect the presence of biological material such as semen. Sergeant Womack testified that the system fluoresces if it detects biological material. Based on information obtained in the investigation, Sergeant Womack used the laser machine to look for semen on the floor of H.B.'s bedroom closet, the clothes hamper in appellant's bathroom, and a pair of appellant's shorts found in the hamper. The analysis of appellant's shorts revealed the presence of semen on the right inside leg of the shorts.

**6.     Ashlyn Henshaw**

Ashlyn Henshaw, a DNA Section Supervisor for the Texas Department of Public Safety (DPS) Crime Laboratory, testified about the laboratory results for the items collected and submitted in the case to the crime lab for testing. The items consisted of swabs from the floor of H.B.'s home, shorts and a t-shirt belonging to appellant that were collected from a hamper in the master bathroom which appellant shared with H.B.'s mother, and an oral swab that was collected from H.B. by the SANE examiner. Henshaw testified that the presumptive testing for semen on the floor swabs was negative, the presumptive testing for semen on the t-shirt was

negative, and the testing on H.B.'s oral swab was inconclusive. She testified that the presumptive test for semen on appellant's shorts was positive for male DNA.

7.    **H.B.**

H.B. was twenty years old at the time of trial. She testified that her biological father was incarcerated at Leavenworth Federal Penitentiary in Kansas. She believed that her mother lived in Canyon Lake but was unsure of the exact location.

When H.B. was eleven years old, she lived in Marion, Iowa, with her mother and two brothers. H.B. testified that she shared a bedroom with her brothers, and that she had her own bed and her brothers shared a twin bed. When she was in fifth grade, H.B., her mother, and her brothers moved into appellant's house. H.B. testified that the house was big, with eleven bedrooms and six-and-a-half bathrooms. She was excited to move into the house because she had her own room and bathroom and there was a horse she could ride. H.B. testified that appellant was nice and welcoming when they first moved in and that she looked up to him as a stepfather.

H.B. testified that one day she asked appellant if he would take her for a motorcycle ride. They went to B-Bop's restaurant in Altoona, Iowa, and from the restaurant they could see an amusement park called Adventureland. Appellant asked H.B. if she would like to have a season pass to Adventureland, and H.B. replied that she would. Appellant told her that she would have to take off her clothes when they got home in exchange for a pass. When they returned home, they went to H.B.'s

bedroom, and appellant sat on the bed while H.B. stood in front of him and took her clothes off. Appellant asked H.B. if he could touch her breasts. When H.B. said yes, appellant grabbed her breasts. H.B. testified that she felt uncomfortable. Appellant told her not to tell anyone and, if she did, she would never see her grandmother again, she and her brothers would be separated and "go into the system," and H.B. would not be able to see her mother again. After H.B. put her clothes back on, appellant took her to Adventureland to get a season pass.

H.B. testified that her relationship with appellant returned to normal afterwards and she acted as if nothing had happened. H.B. testified that she was ashamed of what had happened and blamed herself. She testified that her family had been previously involved with CPS and she knew that they could remove children. H.B. testified that she was scared that if she told anyone she would have nowhere to live and that she would be separated from her brothers.

H.B. testified that when she was in sixth grade, she asked her mother for a phone but her mother could not afford to buy her one. Appellant later offered to get H.B. a phone in exchange for "at least a blow job." H.B. testified that appellant wanted to try to have sex with her as well. While her mother was in the shower, H.B. and appellant went to the garage. Appellant instructed H.B. to take her clothes off, and appellant took his clothes off as well. H.B. testified that appellant attempted to

have sex with her but it hurt and she pushed appellant off of her. Afterwards, H.B. performed oral sex on appellant.

H.B. testified that appellant tried to have sex with her on multiple occasions but that it did not work. On one occasion, appellant tried to have sex with H.B. in his bed and used a small pink vibrator. H.B. testified that appellant eventually got a phone for her.

H.B, her mother, and her brothers later moved to Houston with appellant. H.B. testified that she continued to perform sexual acts with appellant in exchange for gifts. On one occasion, appellant took H.B. to a hotel to have sex with her in exchange for a new iPhone and clothes. H.B. testified that appellant penetrated her a little bit that time and that he took her to the same hotel on multiple occasions.

In addition to the hotel, appellant came to H.B.'s room on many occasions to touch her while she was sleeping and that she began wearing a bra at night because of it. On one occasion, appellant told H.B. "next time, don't wear a bra." H.B. testified that her mother, who was in the nearby laundry room, overheard appellant and "started freaking out." H.B. testified that this incident was the first time her mother learned about appellant's abuse.

The summer before H.B. began eighth grade, she moved to a house on Irene Drive in Canyon Lake with her mother, brothers, and appellant. H.B. testified that her mother began sleeping in H.B.'s room to protect her from appellant. Appellant

continued coming into H.B.'s room at night to wake her up and tell her to come back to his room. H.B. testified that she "was done trying to have sex" with appellant because it hurt, and she mainly performed oral sex on him instead.

H.B., her mother and brothers, and appellant later moved into a house off Eden Ranch Drive in Canyon Lake. One day, appellant was home early when H.B. returned from school. When H.B. asked appellant why he was home so early, he showed her an iPad in a black and pink case and told H.B. she could have it if she gave him "a blowjob at least." H.B. testified that appellant was wearing an orange Texas Longhorns shirt and long shorts at the time. Appellant and H.B. went into her bedroom closet where she began performing oral sex on appellant. H.B. testified that when her mom arrived home, appellant quickly pulled his pants up and ran out the back door to his bedroom. H.B.'s mother began screaming and calling H.B. names.

The next day, H.B. received a dress code violation at school. H.B. testified that a dress code violation meant that a student could either change clothes or receive an in-school suspension (ISS). H.B. opted to change clothes but there were no extra shirts in the school nurse's office so H.B. was told she had to sit in ISS for the day. H.B. refused and ran out of the school. When the school's assistant principal and a police officer caught up with H.B. and asked her where she was going, H.B. told them she was not going back to her "crazy mom" or "pedophile stepdad." H.B. returned to school and told the school counselor about appellant's sexual abuse of

her. Afterwards, CPS picked H.B. up at school and took her to the hospital for a SANE exam. H.B. testified that she and her brothers were placed in a youth home shelter. H.B's grandparents were later granted temporary guardianship of H.B. and her brothers. H.B. and her brothers returned to live with their grandparents in Iowa.

## 8. Noella Hill

Hill, a registered nurse and SANE examiner, performed a SANE exam on H.B. on March 9, 2016. Hill testified that a SANE exam consists of taking a patient's medical history, a physical exam, and a genital exam.

During the history portion of the SANE exam, H.B. told Hill about appellant's sexual abuse of her over the years, the dress code violation at school, and her outcry to Mickey. Hill testified that H.B. was very upset during the exam and was concerned about her mother getting into trouble. Hill collected oral swabs of H.B.'s mouth. Hill testified that H.B. had eaten, drank, and brushed her teeth/used mouthwash between the incident of sexual abuse and her SANE exam. Hill testified that H.B. declined a genital examination. H.B.'s medical examination records were admitted into evidence as State's Exhibit 45.

After both sides rested, the jury found appellant guilty of aggravated sexual assault of a child and sexual assault of a child. During the punishment phase, appellant pleaded true to a prior conviction for a third-degree sex offense as alleged in the indictments. After the jury found the enhancement paragraph true, it assessed

appellant's punishment at confinement for life in the Texas Department of Criminal Justice in each cause. The trial court ordered that the sentences run consecutively.

## Sufficiency of the Evidence

We first consider appellant's second issue in which he claims that the evidence is legally insufficient to support his convictions because, if sustained, that issue would afford the greatest relief. *See Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) (citing TEX. R. APP. P. 43.3). *In re D.L.W.W.*, 617 S.W.3d 64, 77 n.31 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("Because legally insufficient evidence requires a rendition of judgment in favor of the party raising the challenge, we must address a legal-sufficiency challenge first."); *Campbell v. State*, 125 S.W.3d 1, 4 n.1 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

### A.    Standard of Review

We review appellant's challenge to the sufficiency of the evidence under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Under that standard, we examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 318–19. Evidence is insufficient under this standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence

12

probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the acts alleged do not constitute the criminal offense charged. *See id.* at 314, 318 n.11, 320; *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009); *Mottin v. State*, 634 S.W.3d 761, 765 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd).

The jury is the sole judge of the credibility of witnesses and the weight to give their testimony, and our role on appeal is simply to ensure that the evidence reasonably supports the jury's verdict. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit. *Galvan-Cerna v. State*, 509 S.W.3d 398, 403 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Canfield v. State*, 429 S.W.3d 54, 65 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). Inconsistencies in the evidence are resolved in favor of the verdict. *See Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

"Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction." *Nisbett v. State*,

552 S.W.3d 244, 262 (Tex. Crim. App. 2018). "On appeal, the same standard of review is used for both circumstantial and direct evidence cases." *Hooper*, 214 S.W.3d at 13.

**B.    Applicable Law**

A person commits aggravated sexual assault of a child if the person intentionally or knowingly causes the penetration of the mouth of a child younger than fourteen years of age with the male sexual organ of the person or causes the mouth of a child younger than fourteen years of age to contact the male sexual organ of the person. TEX. PENAL CODE § 22.021(a)(1), (2)(B). A person commits sexual assault of a child if the person intentionally or knowingly causes the penetration of the mouth of a child younger than seventeen years of age with the male sexual organ of the person or causes the mouth of a child younger than seventeen years of age to contact the male sexual organ of the person. *Id*. § 22.011(a), (c).

**C.    Analysis**

Appellant contends that the evidence was insufficient to support his convictions because (1) physical and DNA evidence linking him to the charged offenses was lacking, (2) there were inconsistencies in the witnesses' testimony, (3) H.B. had more than one motivation to make an outcry, and (4) the other witnesses' testimony was not corroborating evidence but merely bolstering. The State responds that when the combined and cumulative force of the evidence, and reasonable

14

inferences from that evidence, are viewed in the light most favorable to the jury's verdict, the evidence of appellant's guilt was overwhelming and therefore legally sufficient.

The uncorroborated testimony of a child victim is alone sufficient to support a conviction for sexual assault of a child. TEX. CODE CRIM. PROC. art. 38.07(a); *Gonzalez v. State*, 522 S.W.3d 48, 57 (Tex. App.—Houston [1st Dist.] 2017, no pet.). The State has no burden to produce any corroborating or physical evidence. *Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006) ("The lack of physical or forensic evidence is a factor for the jury to consider in weighing the evidence.").

Here, H.B. testified that when she was eleven years old, appellant took her on a motorcycle ride to B-Bop's restaurant in Altoona, Iowa. They could see an amusement park called Adventureland from the restaurant. H.B. testified that appellant asked her if she would like to have a season pass to Adventureland and, when she replied "yes," he told her she would have to take off her clothes when they got home in exchange for the pass. H.B. testified that when they returned home, they went to H.B.'s bedroom, appellant sat on her bed while H.B. stood in front of him, she took off her clothes, and appellant grabbed her breasts. After H.B put her clothes back on, appellant took her to Adventureland to get a season pass.

H.B. testified that when she was in sixth grade, she asked her mother for a phone but her mother could not afford to get her one. Appellant later offered to get H.B. a phone in exchange for "at least a blow job." While her mother was in the shower, H.B. and appellant went to the garage. Appellant instructed H.B. to take her clothes off, and appellant took his clothes off. H.B. testified that appellant attempted to have sex with her, but it hurt and she pushed him off of her. Afterwards, H.B. performed oral sex on appellant. H.B. testified that appellant tried to have sex with her on multiple occasions but it did not work. On one occasion he tried to have sex with H.B. in his bed and he used a small pink vibrator. H.B. testified that appellant eventually got a phone for her.

H.B. testified that she continued to perform sexual acts with appellant in exchange for gifts after they moved to Houston. On one occasion, appellant took H.B. to a hotel to have sex with her in exchange for a new iPhone and clothes. H.B. testified that appellant penetrated her a little bit that time, and that he took her to the same hotel on multiple occasions. In addition to the hotel, appellant came to H.B.'s room on many occasions to touch her while she was sleeping.

H.B. testified that the summer before she began eighth grade, when she was thirteen years old, H.B., her mother, her brother, and appellant moved to Canyon Lake. Appellant regularly came into H.B.'s room at night to wake her up and tell her to come back to his room because H.B.'s mom was asleep in H.B.'s bed in an attempt

16

to protect her from appellant. H.B. testified that she "was done trying to have sex" with appellant because it hurt and she mainly performed oral sex on him instead.

After they moved to a house off Eden Ranch Drive in Canyon Lake, appellant was home early one day when H.B. returned from school. H.B. testified that when she asked appellant why he was home early, he showed her an iPad in a black and pink case and told H.B. she could have it if she gave him "a blowjob at least." Appellant and H.B. went into her bedroom closet and she began performing oral sex on appellant. H.B. testified that appellant was wearing a Texas Longhorns shirt and shorts at the time. H.B. testified that when her mother arrived home, appellant quickly pulled his pants up and ran out the back door to his bedroom.

H.B.'s testimony alone about appellant's pattern of sexual abuse of her beginning when H.B. was eleven years old until she was fourteen years old is sufficient to support appellant's convictions. *See* TEX. CODE CRIM. PROC. art. 38.07(a). Contrary to appellant's suggestion, the lack of physical or DNA evidence tying him to the charged offenses does not render H.B.'s testimony insufficient. Neither DNA evidence nor physical evidence is required to support a sexual assault conviction. *See Pena v. State*, 441 S.W.3d 635, 641 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ("The absence of DNA or fingerprint evidence at trial does not render the other evidence insufficient to support the conviction.") (citing *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978) (noting victim's

17

testimony alone was sufficient to sustain rape conviction, despite lack of physical evidence)); *Sims v. State*, 84 S.W.3d 768, 774 (Tex. App.—Dallas 2002, pet. ref'd) (upholding conviction where victim's testimony identified defendant as attacker despite absence of "scientific evidence"); *see also Dudley v. State*, No. 01-20-00175-CR, 2021 WL 4848470, at *3 (Tex. App.—Houston [1st Dist.] Oct. 19, 2021, pet. ref'd) (mem. op., not designated for publication) (stating absence of defendant's DNA on knife and insufficient male DNA on complainant's oral swab did not render other evidence insufficient to support defendant's sexual assault conviction). We note that while the laboratory analyses of the swabs taken from H.B.'s mouth was inconclusive due to the low quantification of male DNA, there was no evidence presented that appellant ejaculated in H.B.'s mouth during the last incident of sexual abuse before her mother arrived home, and there was evidence that H.B. had eaten, drank, brushed her teeth or used mouthwash between the incident and her SANE exam. Further, analysis revealed the presence of semen on the inside of the shorts appellant wore during the last act of sexual abuse. This evidence was consistent with H.B.'s testimony that appellant was wearing those shorts at the time she performed oral sex on him and when he ran out of her room because H.B.'s mother had arrived home.

The jury also heard Wiley's and Mickey's testimony about H.B.'s demeanor and reaction to the dress code violation on March 9, 2016. Wiley, the assistant

principal, testified that H.B. was "very heated, animated" when Wiley caught up with her after H.B. had run out of school, and that she yelled "you can't make me go back" and "I'm not going home to that pedophile." Mickey, the school counselor, testified that H.B. was crying and very upset when she met with her, and that H.B. eventually confided that her mother's boyfriend had fondled her breasts and genitalia and bought her gifts in exchange for sexual acts. H.B. expressed a fear of going home and being around appellant again to Mickey. Hill, the SANE examiner, testified about her evaluation of H.B. and the description of the sexual abuse H.B. provided during the exam. Hill testified that H.B. told her what happened at school and about her outcry to Mickey, and that H.B. provided details about appellant's abuse of her. The jury also saw photographs of H.B. at each of the homes where she had lived with appellant and a copy of the pass to Adventureland that appellant gave her in exchange for the first sexual act she performed for appellant, all of which were consistent with H.B.'s timeline and description of events. There was also evidence that appellant had been previously convicted of sexually abusing a young girl in a manner similar to the manner in which he first abused H.B.

Appellant argues that H.B. had more than one motivation for making the outcry. In particular, he points to H.B.'s testimony that she blamed appellant for her dog's death, she wanted to live with her grandmother in Iowa, and she was upset about being in trouble for the dress code violation at school. He asserts that although

a sexual assault conviction can be supported on the uncorroborated testimony of the child sexual assault victim, there were inconsistencies in the witnesses' testimony and that, under these circumstances, an appellate court can find that the evidence is legally insufficient to support the conviction.

The jury acts as the sole judge of the credibility of the witnesses at trial and may choose to believe all, some, or none of the testimony presented. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Ledford v. State*, 649 S.W.3d 731, 739 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). We defer to the responsibility of the fact finder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from the facts. *See Febus v. State*, 542 S.W.3d 568, 572, 575 (Tex. Crim. App. 2018) ("Though Appellant argues that it was more reasonable for the jury to conclude that the police had made a clerical mistake, we must defer to the jury's resolution regarding competing inferences and evidentiary conflicts"); *see also Riordan v. State*, No. 03-16-00297-CR, 2017 WL 3378889, at *6 (Tex. App.—Austin Aug. 4, 2017, no pet.) (mem. op., not designated for publication) ("Appellant's interpretation of the evidence and testimony, however, simply reflects conflicts in the evidence. These were all matters left to the jury to resolve. Reconciliation of any conflicts or contradictions in the evidence is within the exclusive province of the jury.") (citations omitted). As a reviewing court, we may not re-evaluate the weight and credibility of the evidence in the record and

thereby substitute our own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found the essential elements of the charged offenses beyond a reasonable doubt. Accordingly, we hold that the evidence is sufficient to support appellant's convictions for the offenses of aggravated sexual assault of a child and sexual assault of a child.

We overrule appellant's second issue.

### Challenges for Cause

In his first issue, appellant contends that the trial court erred in denying his challenges for cause to Jurors Nos. 7 and 61.

### A. Standard of Review and Applicable Law

A venireperson is challengeable for cause if he "has a bias or prejudice against the defendant or against the law upon which either the State or the defense is entitled to rely." *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009); *see* TEX. CODE CRIM. PROC. art. 35.16(a)(9), (c)(2). To be challengeable, the bias or prejudice must "substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law." *Gardner*, 306 S.W.3d at 295. "Before a venireperson may be excused based on bias or prejudice, the law must be explained to him, and he must be asked whether he can follow that law regardless of his

21

personal views." *Id.* The proponent of a challenge for cause has the burden of establishing that the challenge is proper by showing that "the veniremember understood the requirements of the law and could not overcome his prejudice well enough to follow the law." *Id.*

"We review a trial court's ruling on a challenge for cause with considerable deference because the trial judge is in the best position to evaluate a veniremember's demeanor and responses." *Id.* at 295–96 (citing *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998)). Thus, a trial court's ruling on a challenge for cause may be reversed only for a clear abuse of discretion. *Id.* at 296. "When a veniremember's answers are ambiguous, vacillating, unclear, or contradictory, we give particular deference to the trial court's decision." *Id.*; *Robinson v. State*, 989 S.W.2d 456, 458 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) ("If a venire member equivocates on her ability to follow the law, the reviewing court must defer to the trial court's judgment.").

## B.  Challenges to Prospective Jurors Nos. 7 and 61

During the panel voir dire discussion, the State questioned Juror No. 7 about witness credibility. The following exchange took place:

> Prosecutor: So as a juror, your job is to listen, to keep an open mind. You can believe some, none or all of what someone says, if you listen to them and you believe them beyond a reasonable doubt.
>
> So everyone comes in on the same footage. I know I have my police officer here from Hays County—and you knew I was going to

22

call on you—even though, Juror Number 7 here is a police officer and if he came in here and he had on his gun and his badge and he's got on his vest and his gear that he puts on every day, just because he has a badge and a gun doesn't mean he gets more credibility.

Would you agree with that Juror Number 7?

Juror No. 7: Yes.

Prosecutor: Do you think that you can just judge a book by its cover?

Juror No. 7: No, ma'am.

Prosecutor: All right. So when you come in and when officers come in, you have to be able to look at everything, you've got to listen.

You might have good officers, you might have bad officers. Would you agree with me?

Juror No. 7: Yes, ma'am.

. . . .

Prosecutor: Let me ask you, just because I know he's going to do it, I'm going to get to you first. Because of your experience, your training, you being a police officer, do you still think you could be fair and impartial and sit in a case like this and listen to the evidence—hold on, hold on before you tell me anything—listen to all of the evidence and judge the credibility of each witness keeping an open mind and not rendering a decision until you hear all of it?

Juror No. 7: I do think I could. But I am biased, because like I said, I've taken this report, I've taken this call, I've talked to the victims. I know how in depth the investigations are. So I would be biased.

Prosecutor: Okay. But can you set your bias aside, because your [sic] biased to the offense. You're not biased to this defendant, are you?

Juror No. 7: No.

In the course of both sides making their strikes for cause, defense counsel asked Juror No. 7 about several of his earlier responses:

Defense Counsel: During Ms. Frazier's voir dire, during her jury questions, you talked a little bit about having some bias about a case like this because of your work.

Juror No. 7: I think it's possible, yes, sir.

Defense Counsel: Can you explain that a little bit more?

Juror No. 7: Well, I'm a deputy with the Hays County Sheriff's Office and I have taken sexual assault reports, sexual assault of a child. Just saying that I have that kind of insight that a normal civilian would not.

Defense Counsel: So if somebody comes and testifies and it's different from what your personal insight is to these kind of cases, are you going to rely on your personal insights or are you going to rely on what the testimony is in the courtroom?

Juror No. 7: I wouldn't say that. I was just saying that I have a different perspective, that's all. So I would rely on the other testimony and evidence presented.

Defense Counsel: Okay. When you say you have a bias on these cases, does your work effect how you're going to hear the evidence in this case?

Juror No. 7: I think—so you're talking about credibility, that I might put more weight into, say, an officer or investigator's testimony than say your average other person might.

Defense Counsel: Why is that?

Juror No. 7: Because of my experience and I know what these guys do, and I don't think that they are doing anything—I'm not going to say wrong. But they are not misrepresenting anything like that.

Defense Counsel: So are you going to treat them with—sort of a starting point, are you going to treat them with more credibility than another witness?

Juror No 7: Yes. That's kind of what I was trying to say with the whole bias part.

Defense Counsel: Okay. Would you be able to set that aside and treat them equally like any other witness who came in, or is that bias going to affect your ability to hear the case?

Juror No. 7: I can certainly try, but like I said, being a police officer and seeing other police officers knowing what they go through and what they do.

Defense Counsel: So I kind of need a yes or no. Sorry to flip that script back on you.

Juror No. 7: No, no. I understand. I want to say yes, but it might—I'd have to say no just to be on the safe side, because like I said, if I see another officer, I'm going to assume that he's doing everything by the book and wants what's best for the victim and justice in general.

Defense Counsel: Pass the witness.

Prosecutor: So are you going to assume or are you going to wait to hear what he's done and look at his credentials and listen to the evidence before you give that weight?

Juror No. 7: No. Of course, I'm going to listen to everything. I'm just saying I'm going to be—I would start off with believing him more.

Prosecutor: Well, you understand that the law says you can't do that?

Juror No. 7: Right.

Prosecutor: Okay. And so does that mean, then, at this point, you're going to—even though the law would be that you cannot do that, you would still do that? You couldn't set that aside and take them as equal?

Juror No. 7: I could do that. I could put it aside and look at them—I don't think they are lying or anything like that. But I'm trying to be honest.

Prosecutor: No, I agree. And you understand there are good cops and bad cops, right? There's cops out there that have done wrong?

Juror No. 7: Yes, ma'am.

Prosecutor: Maybe they have handled the scene improperly or maybe they have done something in their personal life that causes them to be on a Brady list or some sort of thing. So not every cop is assumed to be credible just because they are cop [sic]. Would you agree with that?

Juror No. 7: Yes, ma'am. Good point.

Prosecutor: And so when an officer comes in, can you set aside the preconceived notion that you assume they are all good, and listen to the testimony, listen to the credibility and listen to what they did and see if that is sufficient and that is—and then you can give whatever weight you want to their testimony. You can give more, less, none at all, but you have to wait. And that's the question, can you wait? If you can't, that's totally fine.

Juror No. 7: I can. I just want to be completely upfront and honest. I mean, that's just—

Prosecutor: But your bias isn't against this defendant?

Juror No. 7: Of course not.

Prosecutor: So your bias is against the crime of sexual assault of a child?

Juror No. 7: Yes.

Following the exchange, defense counsel moved to strike Juror No. 7 because "he stated clearly he's going to hold some witnesses with more credibility than

others before hearing the evidence." The prosecutor responded that Juror No. 7 stated only that he had a bias against the offenses and not against appellant. She argued that after Juror No. 7 was provided with an explanation of the law, he confirmed that he could follow the law. The trial court denied defense counsel's challenge for cause to Juror No. 7.

During his portion of voir dire, defense counsel asked the jury panel the following question:

> So the question I've got is: Are you going to be able to, given this kind of case, the kind of evidence that we expect to hear, are you going to be able to sit and listen to all the evidence? I'm just going to go through from the beginning, all right?

Juror No. 61 answered "no."

Later, defense counsel asked Juror No. 61 about her answer to the question:

> Defense Counsel: Do you remember during my section of the questions where I was asking about an ability to listen to all the evidence in the case? Do you remember what your answer was?
>
> Juror No. 61: It was no.
>
> Defense Counsel: Can you explain that?
>
> Juror No. 61: Yes. I have one of those minds that relives and rethinks. I can't watch movies, certain movies. I can't read books because I just play things over and over in my mind. And I know I would play, whether it's words or visuals, it doesn't matter, I would play it over and over in my mind. That would be difficult for me.
>
> Defense Counsel: So I think you answered a couple of different questions that maybe I didn't ask. So what is—would you be able to listen to all the evidence in a trial like this and not make your mind up

27

after just hearing a portion, but keep your mind open and listen to all the evidence?

Juror No. 61: I could listen to it, but it would be difficult on me physically.

Defense Counsel: Okay. What do you mean by that?

Juror No. 61: I probably wouldn't sleep at night.

Defense Counsel: All right. So—

Juror No. 61: Depending on what was said.

Defense Counsel: So you would listen to the evidence, but how would that affect your ability to make a decision?

Juror No. 61: It would not affect the way I made a decision; it would affect me personally.

Defense Counsel: All right. Are you able to listen to the evidence in this case?

Juror No. 61: I would do it if I was called. And I would deal with my own physical—I could deal with it for a week.

Following this exchange, defense counsel stated, "I don't know what to do with that answer, Judge. I'm going to move to strike for cause." The trial court denied the challenge for cause to Juror No. 61.

Prior to the sides exercising their peremptory challenges, defense counsel requested two additional peremptory challenges "because of the two strikes . . . that were not granted to the defense. That was [Juror] Number 7 and [Juror] Number 61." The trial court denied the request. The jury was seated and sworn.

Before the start of testimony the next day, defense counsel advised the trial court that he had a couple of housekeeping issues:

> Number one, I was a little imprecise yesterday at the end of the day because I was tired. When I stated on the record that I did not object to the jury as seated, I was not intending to waive any objections during the strike conferences. I was merely not objecting to the jury as that it reflected the strikes that I actually made, and that none of the people that I struck were seated on the panel.

> . . . .

> The second issue there is the final step, I believe, which I—because I was tired, that I didn't take was to identify the people that I would have struck if I had gotten the extra strikes or if the Court had done those.

> And this is just as a proffer, not asking—it's just an issue that I offer as a proffer, is that Jurors 21 and 32 would have been the strikes that I would have made if the—and I had noted those. Those are—and I would tell the Court as an officer of the Court, those were in my notes yesterday as the strikes that I did not make, that I would have made next if I'd had—if those numbers—if the ruling had been different.

## C.    Preservation of Error

We initially address the State's contention that appellant waived his claim that the trial court erred in denying his challenges for cause to Jurors Nos. 7 and 61. To preserve error for a trial court's erroneous denial of a challenge for cause, appellant must show that (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of venire member; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury. *Green v. State*, 934 S.W.2d 92, 105 (Tex.

Crim. App. 1996). The defendant must make the proper objection before the panel is sworn. *Credille v. State*, 925 S.W.2d 112, 115 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd).

### 1. "Clear and Specific Challenge"

After both sides questioned Juror No. 7, defense counsel moved to strike him on the ground that "he stated clearly he's going to hold some witnesses with more credibility than others before hearing the evidence." The prosecutor responded that Juror No. 7 stated only that he had a bias against the offenses and not against appellant, and that after Juror No. 7 was provided with an explanation of the law he stated that he could follow the law.

The State argues that appellant waived his claim of error because he did not articulate a clear and specific challenge for cause *after* the State explained the law to him. Appellant's statement that he was moving to strike Juror No. 7 because "he stated clearly he's going to hold some witnesses with more credibility than others before hearing the evidence" was sufficient to preserve his claim of error with respect to Juror No. 7.

Following questioning of the venire panel, Juror No. 61 was questioned individually regarding her ability to serve on the jury. After Juror No. 61 was excused, defense counsel stated, "I don't know what to do with that answer, Judge. I'm going to move to strike for cause." The trial court denied the challenge.

The State argues that appellant waived his claim of error with respect to Juror No. 61 because he did not articulate a clear and specific challenge for cause. We agree. Defense counsel's statement that he "[did not] know what to do with [Juror No 61's] answer" was not a clear and specific challenge for cause to Juror No. 61.

## 2. "Objectionable Juror"

The State also argues that although appellant requested two additional peremptory challenges, he failed to identify in a timely manner which objectionable jurors sat on the jury because his peremptory challenges were exhausted by exercising them on Jurors Nos. 7 and 61.

The record reflects that defense counsel only identified the objectionable jurors—Jurors Nos. 21 and 32—after the jury had been seated and sworn. Appellant's objection to the composition of the jury after it was sworn and seated failed to preserve error. *See Credille*, 925 S.W.2d at 115 ("[An] objection after the jury was sworn [i]s not timely . . . Because [the] appellant failed to press the trial judge to make a specific ruling before the jury was sworn, he failed to preserve error."); *see also Dimas v. State*, No. 14-01-01123-CR, 2002 WL 31769381, at *2 (Tex. App.—Houston [14th Dist.] Dec. 12, 2002, no pet.) (mem. op., not designated for publication) ("Appellant's assertions identifying the objectionable jurors, after the jury panel was sworn in, were not timely; thus, appellant failed to preserve error.").

**D. Trial Court's Rulings**

However, even if appellant had preserved his claim of error, the trial court did not abuse its discretion in denying appellant's challenges for cause to Jurors Nos. 7 and 61.

**1. Juror No. 7**

Appellant argues that Juror No. 7, a deputy with the Comal County Sheriff's Office, made it clear that he had a bias in favor of the State. Thus, he argues, the trial court erred in denying his challenge for cause.

During questioning, Juror No. 7 agreed that a testifying officer is not entitled to more credibility because he comes in with a gun and badge, and that there are good and bad officers. He stated that he was biased because of his experience working these types of cases and has a different perspective than civilians but he thought he could keep an open mind and not reach a decision until he heard all the evidence. When asked if he would rely on his personal insights or the testimony at trial, Juror No. 7 responded that he would rely on the evidence presented at trial. Juror No. 7 stated that he would initially treat an officer's testimony with more credibility than another witness' testimony. When the prosecutor explained that the law prohibits him from doing so and asked whether he could set aside his bias and treat witnesses equally, Juror No. 7 stated that he could.

"When the record reflects that a venire member vacillated or equivocated on his ability to follow the law, the reviewing court must defer to the trial judge." *Gardner*, 306 S.W.3d at 295. "A trial judge's ruling on a challenge for cause may be reversed only for a clear abuse of discretion." *Id*. at 296. Here, Juror No. 7 vacillated and equivocated on whether he would treat law enforcement witnesses with "more credibility than another witness." While Juror No. 7 expressed that he would initially treat a testifying officer with more credibility than another witness, after he was provided with an explanation of the law he stated that he would listen to the evidence before determining the weight to give to the testimony. *See Ladd v. State*, 3 S.W.3d 547, 560 (Tex. Crim. App. 1999) (stating jurors "are not challengeable for cause simply because they would give certain classes of witnesses a slight edge in terms of credibility, because '[c]omplete impartiality cannot be realized as long as human beings are called upon to be jurors.'") (quoting *Jones v. State*, 982 S.W.2d 386, 389 (Tex. Crim. App. 1998)); *see also Nunez v. State*, No. 13-17-00671-CR, 2019 WL 1831715, at *5 (Tex. App.—Corpus Christi-Edinburg Apr. 25, 2019, pet. ref'd) (mem. op., not designated for publication) ("Juror 12 vacillated on her answers concerning impartiality, but she is not biased as a matter of law. She stated that she understands the defendant's right to a fair trial and she indicated that she would try to be impartial even though she was not completely certain of her ability to do so. Thus, we will afford great deference in this case to the

33

trial court's discretion because the trial court was in the best position to evaluate juror 12's answers and demeanor"). Affording deference to the trial court's discretion, we conclude that it did not abuse its discretion in denying appellant's challenge for cause to Juror No. 7.

### 2. Juror No. 61

Appellant argues that the trial court erred in denying his challenge for cause to Juror No. 61 because she made it clear she had a bias when she stated she would be physically affected by having to listen to the evidence. Appellant asserts that a juror who cannot listen to the evidence without having serious physical consequences or worries about her psychological well-being cannot be fair and impartial.

In response to a general question to the venire members asking whether they had the ability to sit and listen to the evidence, Juror No. 61 responded "no." Defense counsel later questioned the juror individually about her answer. Juror No. 61 stated that she has the type of mind that replays things over and over and that hearing the evidence would physically affect her. When asked whether the physical impact of listening to the evidence would affect her ability to reach a decision, Juror No. 61 unequivocally responded that it would not affect the way she made a decision and that it would only affect her personally. When asked whether she could listen to the

evidence, she replied that she would if called and could deal with the physical impact.

To be challengeable, a juror's bias or prejudice must "substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law." *Gardner*, 306 S.W.3d at 295. Appellant has not met his burden to establish that his challenge for cause to Juror No. 61 is proper. *See Feldman*, 71 S.W.3d 738. The trial court did not abuse its discretion in denying his challenge for cause to Juror No. 61.

Appellant's first issue is overruled.

## Conclusion

We affirm the trial court's judgments.

Amparo Guerra
Justice

Panel consists of Chief Justice Adams and Justices Farris and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).